Opinion by
McIivaine, J.,
in which Day, J., concurred:
On the 4th of April, 1832, one William Hamilton conveyed to John Street, Jacob Holloway, Benjamin Hoyle, and Henry Crew, in fee, the real estate in controversy, “ in trust and for the use of the Ohio Yearly Meeting of the Society of Eriends.” The property thus conveyed was intended to be used for the purposes of a boarding-school, and soon after suitable buildings were erected thereon, and a boarding-school has been maintained therein ever since.
At the date of this conveyance, the Ohio Yearly Meeting was an unincorporated religious body, exercising ecclesiastical jurisdiction over all members of the Society of Eriends, within certain territorial limits, including the State of Ohio. There was not then, nor is there now, any doubt as to the beneficiary intended by the parties to the conveyance. The Ohio Yearly Meeting was well known to grantor and grantees. Nor did any uncertainty arise as to the identity of the beneficiary, until the 5th day of September,'A. d. 1854.
On the day last named, a separation took place in the Ohio Yearly Meeting, which resulted in the organization of two separate and distinct bodies, each of which assumed the name, and from that time hitherto there have been two associations, each claiming to be the Ohio Yearly Meeting, entitled to the trust property described in said conveyance.
*262 It is admitted by all parties to this action, that there is, and can be, bnt one “ Ohio Yearly Meeting of the Society of Eriendsand, it is further conceded, that one or the other of the bodies, which resulted from the separation referred to, is the true and legitimate Ohio Yearly Meeting, entitled to the usé and benefit of the property and charity above mentioned.
Persons representing each of these bodies, and also the trustees in whom the legal tit] e to the property is no w vested, are before the court. The plaintiffs, who represent the association seeking to recover the possession and use of this property, will be referred to in this opinion as Binns and his associates; and the defendants, who represent the body now in possession of the property, as Ployle and his associates. The former are also known, and sometimes designated, as Guerneyites, and the latter as "Wilburites.
The controlling question involved in the case is, whether Binns and his associates, or Hoyle and his associates, constitute the true and legitimate “Ohio Yearly Meeting of the Society of Eriends.” A finding in favor of one of these parties is necessarily a finding against the other.
Counsel for defendants claim the controlling question in the case to be as follows : “Was Jonathan Binns duly chosen clerk of the Ohio Yearly Meeting of the Society of Eriends, in 1854, according to the rules, discipline, and usages of the meeting and society ?”
A majority of the court are of- opinion that the proposition contained in this claim of defendants is too narrow. Although it may be said to be within the issue, it does not embrace the whole of it. Eor it may be that Binns and his associates are the true beneficiaries of this charity, though it appear that some irregularity intervened in the mode and manner in which Binns was chosen clerk in 1854; or even though the rules, discipline, and usages of the meeting and of the Society of Exiends did not provide at all for the emergency which arose in the xnatter of *263 choosing a clerk for the meeting at its session in that year.
It is quite certain, as it will hereafter appear, that the separation did not take place until Binns assumed to exercise the office of clerk, and it is equally certain that immediately upon the separation Binns became clerk of one of the resultant bodies, and Hoyle of the other. Now, suppose that after the separation neither Binns nor Hoyle was invested with the office-of clerk of the Ohio Yearly Meeting, in conformity to the rules, discipline, or usages of the meeting or the society, it would not follow that neither of the resultant bodies was the true successor of the Ohio Yearly Meeting, or that this trust failed for want of a beneficiary. Or suppose, as the fact is claimed to be, that Hoyle’s term of office had not expired at the time of the separation, and that he continued to act as the clerk of one of the resultant bodies, still, we think it might be made to appear, that he and his associates were the separatists, and ceased not only to be the “ Ohio Yearly Meeting,” but also ceased to be members of the “ Society of Eriendsand, in either event, it could not be said that they are entitled to the benefits of a trust created in favor of the “ Ohio Yearly Meeting of the Society of Eriends,” as against the other resultant body, which, according to the principles of the society, might prove itself to be the only true Ohio Yearly Meeting of the society.
That there is a “ Society of Eriends,” whose existence does not depend vipon the Ohio Yearly Meeting, although the latter is embraced within and forms part of the former, is a fact not only established by the testimony, but it is not denied by any of the parties. This society is composed of all true “ Eriends in Unity ” throughout the world. To be a member of this society requires more than a mere profession of a particular religious faith. It requires a practical fellowship or unity with, and adhesion to, the whole body of Eriends, not only in matters of faith, but also in matters of ecclesiastical and disciplinary jurisdiction. It was well said by Chief Justice Shaw, in Earle v. Wood, 8 *264 Cush. 464: “ Men are not bound to be Quakers, but if they would be Quakers and brethren in unity with each other, and with their common superiors, they must conform to their rules and judgments. . . . The reasons might satisfy their own consciences in separating, but in doing so, they cease to be Quakers, or Friends in Unity.”
The form of government adopted by this society is peculiar, and remarkable for its lack of centralized power; but, nevertheless, such rules aS' it has provided for its own government and the maintenance of its own integrity stand as the law for our guidance in determining which of the contending parties to this suit constitutes the “ Ohio Yearly Meeting,” embraced within, and composing a part of, the “ Society of Friends.”
This view of the issue brings within the scope of our inquiides all the testimony in the case, embracing more than two thousand printed pages, and requires us to state our conclusions of fact in relation to the following subjects:
1. The history and polity of the Society of Friends.
2. The history and polity of the Ohio Yearly Meeting.
3. The causes which produced the separation in the Ohio Yearly Meeting.
4. The immediate circumstances of the separation.
5. The action and judgment of the “ Society of Friends” in relation thereto.
6. The subsequent relations of the -resultant bodies to the society at large.
I. The distinctive doctrines of Quakerism were first taught in England, shortly before the middle of the seventeenth century. The earliest meetings of this sect of Christians were no doubt held for the purpose of worship only, and it was not until the year 1682 that the “ Society of Friends ” was fully organized for the pux-pose of discipline or church government. In that year, a form of ecclesiastical government was matured and adopted. The system then adopted, and which has been continued ever since, embraced four grades of church judicatories, called meetings — namely, the preparative, the monthly, the quar *265 terly, and the yearly. These were connected and subordinated in the order named — the preparative to the monthly, the monthly to the quarterly, the quarterly to the yearly. The London Yearly Meeting, the only yearly meeting at that time established, was invested with paramount and final jurisdiction over all the subordinate meetings of the society. The jurisdiction of the yearly meeting was both appellate and advisory. Appeals from the decisions of the quarterly meetings were entertained by the yearly meeting. Each quarterly meeting was invested with like jurisdiction over all the monthly meetings within its prescribed territorial limits, and each monthly meeting with like jurisdiction over the preparative meetings within its territory.
Under this system, a preparative meeting can not be “ set up ” or “ laid down ” within the bounds of a monthly meeting, without the consent of the monthly; a monthly meeting without the consent of the quarterly meeting to which it is accountable, or a quarterly without the consent of the yearly meeting.
As there is no question of faith or doctrine involved in this case, it is unnecessary to refer to the order of the society in relation to assemblages for worship, further than to say, that all meetings for worship, are promiscuous, being composed of members of the society, without regard to sex, and open to all persons who may desire admission.
Meetings for discipline or business, however, whether convened for the consideration of secular or spiritual matters, are required to be kept “ select,” by which order it is meant that all persons other than members of the society in unity are excluded, not only from participation in the deliberations of the meetings, but also from being present at their sittings.
Another important rule of the society, and one which is fundamental in the organization of every meeting for discipline, is that every such meeting is constituted of two bodies or branches, one of which is denominated, the men’s, *266 and the other the women’s meeting. These bodies are distinguished hy difference of sex, as the names indicate, and although they meet at the same time and place, they deliberate in separate rooms. Each of these bodies chooses its own officers, and keeps its own minutes ; and though they constitute but one church judicatory, yet they are co-ordinate in power, and must concur in the transacting of all business of the meeting — save only in the management of property, it is usual for the women’s meeting to defer to the judgment of the men’s meeting.
The business of each subordinate meeting for discipline is confined to subjects arising within its own territorial jurisdiction ; yet a singular and important feature in the constitution of the society is, that any and all members of the society, without regard to residence, may, as a matter of right, sit and act in any and all deliberations an'd transactions of any meeting. It is usual, however, for members residing within, the bounds of other meetings to refrain from taking an active part in matters of merely local importance.
Another peculiar rule is found in the mode adopted by the society for ascertaining the" sense and determining the action of a meeting. The result of its deliberations is not determined by the will of a majority or other proportion of the members. A vote is never taken. Unanimity is sought to be attained in all its deliberations. If such result, however, can not be secured, the “ solid sense ” of the meeting is collected by the clerk, who makes a minute thereof and reads it to the meeting. In gathering the sense of the meeting, -the clerk takes into consideration the number, age, intelligence, experience, piety, etc., of those uniting with and of those opposing the measure. If the minute so made be acquiesced in by the members, so that substantial unanimity is secured, it is recorded as the action of the meeting ; but if it be not so acquiesced in, the measure is lost or postponed for further consideration.
From this brief outline of the original organization of the society, and some of the fundamental principles of *267 its constitution, we will pass to an examination of certain changes that have been made in the mode of administering its discipline. At the time its organization was completed as above stated, meetings of the society, subordinate to the yearly meeting, existed in different parts of the world, and many of them were located on the western continent. It was very soon found to be inconvenient, if not impracticable, for the yearly meeting at London to bestow that amount of care and supervision over the western meetings which the necessities of the rapidly growing society required. Hence, as early as the year 1683, the Rhode Island Yearly Meeting (which has long since been known as the New England Yearly Meeting) was “set up” by the society, acting through the London Yearly Meeting. This new yearly meeting was invested with exclusive and final jurisdiction, in all matters of local discipline, over the subordinate meetings of the society which had been established in the New "World. Subsequently, and from time to time, as the convenience or necessity of the society required, other yearly meetings were set up, each of which was invested with like jurisdiction and authority over all the subordinate meetings located within the bounds of certain prescribed territory. <
The testimony does not fully show what preliminary steps are necessary in the establishment of a new yearly meeting, but it is quite certain that no new yearly meeting can be set up in the regular order of the society, until it is recognized and acknowledged as such by all pre-existing yearly meetings; and without such recognition and acknowledgment, it is not in unity with, or a part of, the Society of Eriends.
When regularly established, however, all members of the society residing within the bounds of the new yearly meeting are entitled, as a matter of right, to be present at the sittings of every other yearly meeting, and to participate in all its deliberations; and the members of the society residing within the territory of other yearly meetings may sit and act as members of the new yearly *268 meeting — subject, of course, to tbe presentation of such credentials as are required by tbe rules and usages of the society. Thus the integrity of the society has been preserved, notwithstanding the multiplicity of yearly meetings of co-ordinate jurisdiction, whose several judgments, in all matters of local discipline within their respective jurisdictions, are final and conclusive.
Previous to the year 1854, in addition to the New England Yearly Meeting, we find there had been established upon the western continent, the Philadelphia Yearly Meeting, New York Yearly Meeting, Baltimore Yearly Meeting, North Carolina Yearly Meeting, Ohio Yearly Meeting, and the Indiana Yearly Meeting; and upon tbe other side of tbe Atlantic, the Dublin Yearly M-eeting, in addition to the London Yearly Meeting.
Several other considerations also show the continued integrity of the society and its organization, notwithstanding its polity is maintained and its discipline administered in last resort by co-ordinate and quasi independent judicatories.
1. A person admitted to membership by one meeting thereby becomes entitled to all tbe rights of membership in every other meeting of the society, and the disownment of a member by one meeting excludes him from the rights of membership in all others.
2. The polity of the society .requires its members to intermarry within the pale of the church; yet members residing within the bounds of different yearly meetings intermarry, and tbe issue of such marriages are members of tbe society by right of birth.
3. Ministers of one yearly meeting, upon being “ liberated ” for tbe purpose by their own meetings, have tbe right to exercise their gifts within tbe bounds of any other yearly meeting.
4. The regular order of tbe society requires each yearly meeting to communicate with every other yearly meeting by an annual epistle in relation to the general concerns of tbe society.
*269 5. There is constituted within and by each yearly meeting a committee, called the “ Meeting for Sufferings,” composed of men Friends, which exercises the plenary powers of the yearly meeting during its recess. The members of each meeting for sufferings are entitled to sit and act as members of every other meeting for sufferings. Among the services confided to the meeting for sufferings, as enumerated in the book of discipline, is the following, viz: “ To correspond with such other meetings for sufferings as are, or may be, established by any other yearly meeting of our society, on the common concerns of the society.”
Such is the system of government adopted by this peculiar sect of Christians; and we think, in view of the history and nature of its organization,' it would be a gross mistake to hold that each yearly meeting is a distinct and wholly independent body or society. On the other hand, we are forced to the conclusion that there is but one Society of Friends in the world; that the unity of the society, as it existed when the London Yearly Meeting exercised exclusive jurisdiction over all the subordinate meetings, has not been destroyed; that the establishment of other yearly meetings of co-ordinate powers was for the purpose of convenience in the administration of local discipline, without any intent to impair the integrity of the society as it existed before the multiplicity of yearly meetings.
It is true that the judgment of each yearly meeting, touching matters of discipline arising within its limits, is conclusive as to all other yearly meetings and the society at large, because such judgment is, in theory and in fact, the judgment of the society. All members of the society are concluded, because, if not present participating in the action of the meeting, their absence was voluntary, and hence there is no ground for complaint. The true theory of the system seems to be that the several yearly meetings were organized by the society as organs' through which the society, as such, might pronounce its judgments and maintain its order and integrity. It may be conceded that such a system of government would- be of doubtful *270 utility were its rules and judgments to be enforced by coercive measures. But when we consider its operation for nearly two centuries, and view it in tbe light of the faith in which it was founded — a religious faith that obedience to its precepts and acquiescence in its judgments would be secured through the influence of the Spirit which leads to peace, harmony, and unity — we can neither deny nor doubt its sufficiency to preserve the integrity of an organization whose chief aim and purpose is the maintenance of Christian fellowship and a common faith.
H. The Ohio Yearly Meeting was established in the regular order of the Society of Friends in the year 1812. The territory placed under its care had formerly been within the jurisdiction of the Baltimore Yearly Meeting. The Ohio meeting, from the date of its organization to the year 1845, maintained relations of perfect unity with the society and all its meetings and members, and from that time to date of the separation in 1854, its unity with the society was continued under a state of more or less disorder.
A general sketch of the constitution and polity of this meeting has.been portrayed in the foregoing statement of the history and polity of the Society of Friends. In order, however, to understand the full force of the circumstances connected' with the separation in 1854, it is necessary to state a few additional facts in relation to organization and constitution of yearly meetings.
It appears to have been the original design of the society to make the yearly meeting a representative body merely, whose membership should consist of representatives chosen by the several quarterly meetings.' At a very early period, however, in the history of the society, the yearly meeting was in fact changed to a constituent body, although the feature of representation has been retained. All members of the church are members of the yearly meeting, but it is the special duty of the representatives to attend the yearly meeting and report the condition of their respective quarters. As members of the yearly meeting, the only special *271 duty or power of the representatives is declared in the book of discipline as follows: “ The representatives from the quarterly meetings, both men and women, are annually to choose a clerk and assistant at the close of the first sitting for discipline, whose names are to be reported at the opening of the next sitting.” The disposition to be made of the report of the representatives is not prescribed in the book of discipline; but the testimony shows that it is the usage of the meetings to act upon the reports — that is, the men’s and women’s meetings respectively act upon their separate reports. If the choice of the representatives be unanimous and the report be approved by the meeting, the persons so chosen become clerk and assistant for the ensuing year. If, however, the meeting refuse to approve the persons chosen by the representatives, or if no names be reported, the old officers hold over for another year until the meeting otherwise directs. There is no rule or usage of the society for the guidance of a meeting in the matter of selecting its clerk and assistant other than as above stated. There is no doubt, however, that the meeting may, for the preservation of its organization, select a clerk and assistant in any other emergency, though not provided for in the book of discipline, and that its action in such cases, if not in violation of the principles of the society, would be binding upon all its members.
It is claimed, on behalf of the defendants, that the order and usage of the society require the continuance in office of the old clerk and assistant, in all cases where the representatives are unable to agree upon names to be reported to the meeting. "We think the testimony does not support this claim. It is true that it has been usual, in cases where the representatives failed to agree upon names, for them to make a unanimous report of that fact; and it has been usual in such case for the old cleiks to hold over by consent. But in all cases, as we understand the weight of the testimony, the subject is under the control of the meeting. It is within the power of the meeting to approve or disapprove the report of the representatives, whatever that re *272 port may be. And in any case where the meeting fails to secure new clerks, through the nomination of the representatives, it may act upon the nomination of any member; and if such nomination be acceptable to the meeting, it has the right to unite therein.
HI. The causes which led to the separation in the Ohio Yearly Meeting may be briefly stated.
Prior to the year 1845, certain dissensions arose among Friends in New England Yearly Meeting, which resulted in a schism in the Swanzy Monthly Meeting in the first place, and afterward in Rhode Island Quarterly, to which the former was accountable, and finally, in 1845, in New England Yearly Meeting. Thus two separate and distinct bodies were formed, each claiming to be the true and legitimate yearly meeting of the Society of Friends within the New England jurisdiction.
As to the merits of the controversy in New England, we are not fully informed by the testimony. It does show, however, that the larger of the two resultant bodies, commonly called the G-uerneyites, has been acknowledged and recognized as the true and only yearly meeting of the society by all Friends, and by all other yearly meetings of the society throughout the world, save only the Philadelphia Yearly Meeting and a part of the members of the society residing within its jurisdiction, and also excepting Hoyle and his associates. The testimony also shows that the smaller New England organization, commonly called ’Wilburites, has been disowned and disavowed by all Friends everywhere, with the exceptions named. The former body has also been adjudged by the Supreme Court of Massachusetts, in the case of Earle et al. v. Wood et al., 8 Cush. 464, to be the legitimate New England Yearly Meeting. The regular succession of the New England meeting was there found to be with the larger body, according to the principles of its own constitution and its rules in relation to the administration of local discipline. The relation of the New England Yearly Meeting to the society at large did not become, in that case, a subject for judicial *273 inquiry and determination. In fact, there was no pretense that the regular organization was with the smaller body, and the court found that there was no good cause upon which the separation could be justified. “ The only reason assigned, by way of justification or apology,” said the court, “ is, that they and their friends had been oppressed. "Whether this justification could have availed, had such oppression been proved to have been done or sanctioned by the yearly meeting, would present a very different question. But at this time the yearly meeting had done no-act, refused no application for redress, declared no heretical opinion, nor taken any step to be complained of.”
It is to be regretted that the District Court refused, at the-instance of the defendants, to receive all the testimony offered upon this subject; but enough, we think, was received to justify us in finding that the G-uei’neyites of New England are the true members of the Society of Eriends,, and that the Wilburites are separatists from, and not members of the society.
Immediately after the rupture in New England, a lamentable want of harmony was manifested in the Ohio meeting. Hoyle, the then clerk, and his associates were-in sympathy with the smaller New England body, while Binns and his associates adhered to the larger, or regular New England meeting. Such was the intensity of this disorder in the meeting, that the men’s meeting was not only unable to continue its annual correspondence with. New England, but the representatives were unable to agree, upon names for clerk and assistant, to be submitted to the meeting at its annual sittings. This state of disorder continued from year to year, with one or two exceptions, until 1854. In the meantime, the old clerk and assistant held over by unanimous consent. The women’s meeting, however, whose clerk was in sympathy with the larger New' England body,, kept up its regular correspondence with, that body, except perhaps in the years 1845 and 1853.
TV". The immediate circumstances of -the separation.
*274 At the annual session of the Ohio Yearly Meeting for 1854, the men’s meeting for discipline was duly opened by the old clerk, Benj amin Hoyle. The want of harmony, however, was immediately manifested, and was intensified by the presence of Thomas B. Gould, clerk of the "Wilburite New England Meeting, and a companion from the same body. 'The order of the society, that the meeting be kept select, was insisted upon by the Friends in sympathy with the larger and regular New England meeting. But the clerk ;and others in sympathy with Gould proceeded with business, against the protest of the former, and-without making the meeting select, and without even requesting the -objectionable persons to withdraw ; and so the ordinary business of the meeting was continued, amid much confusion, until the adjournment. After the adjournment, the representatives, in pursuance of the -order of the society, met for the purpose of choosing a clerk and assistant for ■the ensuing year, but were unable to unite upon names to be presented to the meeting. A portion of the representatives, about one-third of the whole number, agreed to report to the meeting the name of Jonathan Binns for clerk, .and James B. Bruff for assistant, and the others agreed to report, simply, that the representatives were unable to unite upon names to be reported for clerk and assistant.
At the next sitting, the report of the representatives being in order,, Jabez Coulsen, one of the representatives, reported “ that the representatives had conferred together, :and a large portion of them had united in proposing the name of Jonathan Binns for clerk, and James B. Bruff" for ■assistant.” Many Friends immediately expressed themselves in favor of this report; and thereupon Nathan Hall, another representative, arose and stated, “ that the representatives had met, but were unable to agree upon names to be offered to the meeting for clerk and assistant,” whereupon many -other Friends expressed themselves in favor of continuing the old clerk and assistant for the ensuing year. The clerk then inquired of Nathan Hall whether it had been laid upon him to make that report, and, being answered in *275 the affirmative, he said, “ Then it is in order.” Many voices again united in favor of Binns and Bruff, and others opposed, when the clerk arose and said, “ It is evident from the report Jabez Coulsen has made, that Nathan Hall’s report is true, and it has always been the usage of this meeting, under such circumstances, to continue the old clerks, and that is the course I am now about to take, as the only one, in my opinion, that can be pursued according to. order and thereupon he made and recorded a minute continuing himself and the old assistant for another year.
Thereupon, Jon athan Binns, being urged thereto by those members who opposed Gould and his companion remaining in the meeting (with one or two exceptions), -went to the clerk’s table, and made a minute of his own and Bruff’s appointment as clerk and assistant; which minute was approved by more voices than is usual on such occasions.
The action of the meeting, upon the report from the representatives, is described by Jonathan Binns as follows : “ I think I can give nearly the order in which those events took place. I did not know my name would be reported by the representatives. Jabez Goulsen made the report from the representatives, naming me for clerk; Nathan Hall made the other report. I heard the clerk ask Nathan Hall whether the representatives required him to make that report. Nathan Hall answered in the affirmative. The clerk next spoke; I think he said, £ This is in order.’ There was a large number of the members of the meeting who united in the name brought forward by the representatives, before the other arose to give his report. There was no unity expressed after Benjamin Hoyle said that they were in order and the other was not. Then there were very few voices that united with me. ... If the representatives report the name of a person not acceptable to the meeting, they would have a right to non-concur in the report. I do not recollect that it ever occurred before, that the meeting non-concurred in the report made by the representatives of a person for clerk. The meeting has a right to consider *276 any person, no matter by whom nominated. I consider’ that the concurrence in my appointment was much more general than is usual in the appointment of clerks. I do. not recollect that there was any opposition; there might have been one or two. The concurrence when Hoyle announced his appointment was not near so general as in my appointment.”
The testimony of Benjamin Hoyle, on the same subject, is as follows: “I will go on to state that Jabez Coulsen proposed the name of Jonathan Binns for clerk, and James B. Bruff for assistant; and immediately Nathan Hall arose —he was sitting right before me. I think there were two in the house about rising to approve Jabez Coulsen’s report, but Nathan Hall arose, and said that the representatives were unable to agree, and, on inquiry, he said he was so instructed to report. I then said the latter was in order and the other was not. Upon that the meeting acted, and I made a minute appointing myself clerk, and W. S. Bates assistant, as at other times, to which there Ayasconsiderable unity of expression, and- a good deal of expression was over the name of Binns, too, from those that favored him; and he was invited, after some time, to the-table. He made his minute, and there Avas considerable expression of unity, perhaps more than usual at that time;' but the question was propounded by some one AA^hether we could take any part in that, as it was a separate organization. He was answered that it was a separate organization, and we could not speak to it or recognize it in any shape.”
On the cross-examination of Benjamin Hoyle, the following questions and answers were made: '
“ Question. At the time you made the decision and entered the minute, stating that you were appointed clerk,, and Ur. Bates assistant clerk, state whether there was or had been a general expression of unity in favor of Jonathan Binns for clerk, such as would have authorized your having recorded any other minute than the one you did» record ?
*277 “Answer. There was a very considerable expression, in -quick succession, in favor of Jonathan Binns and James Bruff, before I read the minute, and before he came to the •fable.
“ Ques. Were there any indications as to whether that was a general degree of unity ?
“Ans. I think it proceeded from Jonathan Binns’ asso■ciates.
“ Ques. Was there any evidence of dissent from it?
“Ans. I think our members took very little part with it .alter it assumed the form of, a separate meeting.
“ Ques. But before that ?
“Ans. There was some. I do not think very much.”
Without transacting other business, Hoyle and his adherents adopted a minute of adjournment to the hour of ten o’clock next day; and Binns and his associates adopted .a like minute, to the hour of eight o’clock next morning.
The separation of the men Friends was thus accomplished. Gould and his companion, and William and Charles Evans, from Philadelphia Yearly Meeting, adhered to the Hoyle organization, while all other visiting Friends .remained with the Binns organization.
At the opening of the women’s meeting, on the second day of the session, the representatives reported that they .had conferred together, and were unable to agree upon names to be presented for clerk and assistant; and no names being in fact presented to the meeting, the old clerk .and assistant were, by unanimous consent, continued for .the ensuing year; and afterward this meeting -adjourned, to meet again the next day at the hour to which the men’s meeting might adjourn. The next morning, at eight o’clock, the Binns organization and the women’s meeting respectively met according to adjournments. These organizations united, and have continued to act in unity, claiming to be the true and legitimate Ohio Yearly Meeting of the Society of Friends.
At ten o’clock of the same day, the Hoyle organization convened in separate session; and at the same time anum *278 ber of women- Friends, instead of adhering to the regular women’s meeting, organized a new women’s meeting, and united with the Hoyle party. These two latter bodies also-claimed to be the true and legitimate Ohio Yearly'Meeting. Thus the schism in the Ohio Yearly Meeting was. finally and completely effected.
Y. After the separation, but before the end of their respective sessions, each of these resultant bodies prepared and sent an epistle to each of the other yearly meetings of the society, containing a statement of the circumstances-of the separation. The letter of the Hoyle meeting stated the circumstances which occurred on the first and second days of the session, substantially as above given, and claimed that Binns and his associates were seceders from the Ohio-Yearly Meeting, and had assumed the name -without any just claim or right. The letter of the Binns meeting set forth the disorders which had prevailed in the Ohio Yearly-Meeting from the year 1845, and their causes, substantially as above stated, together with the circumstances immediately attending the act of separation.
Upon the receipt of these letters, the several yearly-meetings of the society (except Philadelphia) acknowledged the meeting of which Binns was a clerk as the true- and only Ohio Yearly Meeting, and at the same time disavowed and disowned the organization of which Hoyle was-clerk. The Philadelphia Yearly Meeting, in 1855, united with the Hoyle organization, by receiving and answering-its letter, and by sending letters to other yearly meetings-in vindication of its course. Like correspondence was-continued in .1856; but in the year 1857, on account of dissensions within its own borders, growing out of the same difficulties, it ceased its epistolary correspondence-with the Hoyle meeting, and also with all other meetings-of the society. In the meantime, however, it has accorded full rights of membership to professed Friends in unity with each of the Ohio organizations, without giving credit to the letters or certificates of either body.
YI. The relations which have subsisted, since the sepa *279 ration in the Ohio Yearly Meeting, between the society and each of the resultant bodies, are of importance only as they reflect upon the transactions which resulted in the separation. The true character of those transactions are illustrated in view of their results.
“ The Ohio Yearly Meeting” was the proper name of the association to whose use the property in controversy was conveyed. The reason for annexing thereto in this grant the qualifying words “ of the Society of Friends,” does not clearly appear. It does appear, however, that shortly after the Hicksite defection, in 1827, the orthodox Quakers' were in the habit of distinguishing their meetings from those of the Hicksites by the use of those words or others of similar import. But whether these qualifying words were inserted in this deed in descriptio personce of the beneficiary, or as words of limitation, we need not now- inquire. It may be granted that the use of this property would remain to the “Ohio Yearly Meeting,” notwithstaflding its connection with the society should be disrupted by the unanimous action of Friends residing within its jurisdiction. The solution of that question is not necessary in this case. It is conceded that, previous to 1854, the Ohio Yearly Meéting was composed of persons who were members of the Society of Friends, and that in and by the act of separation, two distinct and independent bodies were organized out of the old membership, each of which claim the succession, and that the persons of whom it is composed continue to be members of the Society of Fri'euds. Hence it is that inquiries into the subsequent ecclesiastical relations of these respective bodies become natural and pertinent.'
The testimony clearly shows that Binns and his associates, ever since the separation, have maintained intact the accustomed relations of a yearly meeting with the society, and its several other yearly meetings, save only in the matter of annual correspondence with 'the Philadelphia meeting. Every rule and order of the society for the preservation of its unity have been kept and observed by and *280 with this meeting. Not a tie has been broken, a duty unperformed, or right unacknowledged, whereby the Christian fellowship, which especially distinguishes this peculiar sect, has been interrupted,
On the other hand, Hoyle and his associates, saving only their imperfect affiliation with Philadelphia Yearly Meeting, have, at all times and everywhere, been excluded from fellowship with the society and all its members. The rights of Quakers have been denied to them by meetings and Friends whose standing in the society is undisputed, and at the same time, the Hoyle meeting has ignored or violated the fundamental law of the society, by invading the. territory of other meetings, and setting up within their jurisdictions its own subordinate meetings. To Hoyle and his associates is denied the right to sit in other yearly meetings, except in Philadelphia; the right of ministers to exercise their gifts; the right of intermarriage ; the right to participate in meetings for suffering, and the duty of annual correspondence, whereby their unity with the society, in the Quaker sense of the term, is wholly de•stroyed.
Upon the above stated facts and circumstances, we must now decide which of these associations is the Ohio Yearly Meeting, for whose use the property in controversy is held in trust.
The usual criteria, by which civil courts are enabled to determine the true succession of a voluntary religious association, whose members have been divided by schism, are not found in the facts above stated. No question of faith or doctrine is involved in the case. The legitimate succession has not been determined by any ordinary form of adjudication, before a superior ecclesiastical tribunal.
In the scheme of Quaker government, no superior judicatory has been organized for the exercise of discipline over its yearly meetings. Neither of the contending parties has shown, that, by conforming strictly with prescribed *281 rules and regulations of the society, it has retained the •regular organization of the Ohio Yearly Meeting. Indeed, the testimony shows that there was no prescribed order, ■or established usage of the society, which provided for the ■emergency that existed at the time of the separation. We •are not left, however, in ignorance of the principles of the •society, by which the question at issue can and should be determined.
If the Ohio Yearly Meeting had been composed of one organized body only, and the women’s meeting alone had ■constituted the yearly meeting, there would be no room for ■doubt as to the legitimate succession. The women’s meeting of the Ohio Yearly Meeting, without interruption in the regularity of its organization, composes a part of the yearly meeting represented by Binns and his • associates; •and though the women’s meeting is part only of the yearly meeting, its organization is as essential to a regularly constituted yearly meeting as is the men’s meeting.
The regular succession in the men’s meeting, however, when considered as a separate organization, is not so apparent. This subject has received much consideration; and after the fullest inquiry into the facts, and the laws of the society, we are of opinion that Hoyle, whose term of -office, as clerk of the meeting for the preceding year, was about to expire at the time of the separation, acted without authority, and without precedent, in deciding, under the circumstances, that he and the old assistant were entitled -to be continued in office for the ensuing year. The matter of choosing a clerk and assistant was properly before the meeting for its action and determination. The representatives had failed to unite upon names to be presented to the meeting ; but, nevertheless, the names of Binns and Bruff had been presented by a report from a portion of the representatives — a minority it is true, but whether by a minority or majority, it was within the power of the meeting, and of the meeting only, as such, to determine whether the report should or should not be adopted. The «ole duty of the clerk in the premises, as we understand it, *282 was to collect and minute the sense of the meeting upon the question. According to the order of the society, the sense of the meeting was determinable only by the expressed will of the members. Those wbo remained silent should have been regarded as indifferent on the subject, or as willing to acquiesce in the result as ascertained from the voices of those who were not indifferent, and with whom the question was a matter of conscience. That a large majority of those members, who spoke to the question at all, united in favor of Binns and Bruff, is not a disputed fact. And, although the clerk, in collecting the-sense of the meeting, should not have been controlled simply by a majority of voices, yet such majority was an important element in determining'the sense of the meeting.
The objection to the action of Hoyle, however, is not simply that he made a mistake in collecting the sense of the meeting — the irregularity in his conduct was, that he-did not attempt to collect it at all, but arbitrarily decided in favor of his own appointment. The honesty of his motives is not impugned — his mistake was in extending a rule or usage to a case where it did not apply. It is probable, but not at all certain, that substantial unity in favor •of Binns and Bruff would not have been attained, if IToyle had made a minute in favor of the minority report; and in that event, the report would have failed of adoption, and, as a matter of necessity, as well as of order, the old clerk and assistant would not have been superseded. But this being conceded, it does not follow that Hoyle can be justified in his assumption of the right to officiate for another year, without having attempted to ascertain the sense of the meeting upon the subject. It may also be conceded that, if no names had been presented to the meeting for clerk and assistant, after the failure of the representatives to agree, the usage of the society and of the yearly meeting, would have continued the old officers for another year. But such is not this case. Nominations ■were in fact made, and the meeting was thus called upon *283 to act; and though there was no prescribed rule or established usage for such a case, the testimony shows, as reason itself would dictate, that the subject was within the power of the meeting, and not within the control of the clerk.
The old clerk having failed to discharge his duty to the-meeting, Jonathan Binns, the nominee for the office, undertook to collect the sense of the meeting as he understood it to have been expressed, and made a minute accordingly of his own appointment. The question now arises, whether the minute so made can be regarded and sustained as the action of the meeting? Two objections-are urged against it: 1. That it was not made by the-clerk; 2. That it did not express the true sense of the-meeting.
As to the first objection, it is true that, by the book of discipline, the duty of collecting and recording the sense-of the meeting is imposed upon the clei’k; and no provision is made therein for the contingencies of his absence, inability, or refusal to act. Yet, if we are right in the-conclusion that Hoyle failed and refused to collect the sense of the meeting upon the nomination of Binns and Bruff, it can not be doubted that Binns was justified in assuming to discharge that duty, if it were the desire of the meeting that he should do so. Although the mode adopted was not prescribed in the book of discipline, or1 sanctioned by a general usage, still the necessity of the-case was a sufficient warrant for the action. The case,, however, was not without a precedent. During the Hick-site troubles, the clerk of a quarterly meeting, within the-jurisdiction of the Ohio Yearly, refused to minute the appointment of his successor, and thereupon the nominee collected the sense of the meeting upon his own nomination and made a minute of his own appointment, though the old clerk at the time was at the table. This action of the quarter, and of the new clerk, was afterward approved by the yearly meeting.
As to the second objection, it may he said, in the first *284 •place, that the expressions of unity in the appointment of Binns and Bruff, actually made by members, would un■questionably have justified a minute in their favor, if it had been made by Hoyle as clerk of the meeting. In the second place, we feel doubly assured that this objection, as well as the first, must fail when considered in the light of .all the circumstances of the case.
The opposition to the appointment of Binns and Bruff •was made by those in sympathy with the separatists in New England, who, by adhering to Gould and other disowned members of the society, were promoting disorder .and schism in the Ohio Yearly Meeting. However sincere in their motives and conscientious in judgment, they were .acting in disregard of the order of the society, and therefore their voices should not have controlled the meeting.
Disorder and dissension had prevailed at the meetings •for discipline for years. At the time of the separation, Hoyle, as clerk, sustained by his associates, was conducting the business of the meeting in open violation of the •order of the society in not making and keeping the meeting select. The friends of order and unity had forborne until all hoj>e of a reconciliation had failed; and, in their judgment, the time had come for choosing between the •.alternatives, of either dissolving their unity with the society and ceasing to maintain its order, or of freeing themselves from the official control of those in sympathy with •the separatists. They chose the latter, and in doing so, -our opinion coincides with that of the great body of Friends arid of their yearly meetings throughout the world, •that they -were fully justified in using the means adopted •for the accomplishment of their ends.
We do not defer to the opinions of Friends, or the decisions of their yearly meetings, as conclusive upon the question before us. Yet the connections and relations between yearly meetings are such that we are not at liberty to wholly disregard their judgments in the premises. If the question related merely to the manner in which local discipline had been administered by the Ohio meet *285 ing, all other yearly meetings would have been hound to-acquiesce in its decision. The disorder undoubtedly began in a matter of discipline, hut it ended in separation before-the question of discipline was determined. After the separation, each party enforced the discipline according to its own judgment of right. But by the laws of the society there could exist only one yearly meeting within this jurisdiction ; hence the question arose, which of the bodies constituted the true Ohio Yearly Meeting? This question-involved the unity of the society, and was one in which all the yearly meetings had an interest. It became a question-of identity, or succession, to be determined according to-the laws and usages of the society. Although, as we have-said, one yearly meeting has no control over matters of local discipline arising within the jurisdiction of another,, still, other matters, which affect the general welfare of the-society, are within cognizance of each and all the yearly meetings. As we understand it, such is the theory of Quaker government, and such also has been the practice-under it. Eor instance, in 1827, the followers of Elias - Hicks, embracing a majority of the members present at the Baltimore Yearly Meeting, and including the regular-officers of the meeting, seceded from their unity with the - society upon questions of doctrine; whereupon the minority assembled and organized anew, claiming to be the true - and only Baltimore Yearly Meeting of the society. This claim was submitted to and acted upon by the several other yearly meetings. Thus the orthodox Friends, so • organized, were recognized and acknowledged by all other yearly meetings (including the Ohio Yearly Meeting) as constituting the true and legitimate Baltimore meeting; while the seceders, though possessing the apparent regular ■ organization, were disowned and ceased to be of the society.
The action of each yearly meeting, in relation to matters • of general concern, is certified to the others, in its annual epistle. And though the judgment of a yearly meeting, in relation to such concern, is not regarded as conclusive and . binding upon the society until united in by all the meet- - *286 ings, yet it is regarded by Friends as entitled to great weight in the deliberations of other meetings upon the .same subject.
Sometimes the judgment of the society at large is obtained through a general conference, whose report is submitted to and approved by the several yearly meetings.
It has always been regarded .by Friends as not only a right, but the duty of yearly meetings, to advise and admonish each other in relation to matters affecting the unity and order of the society; and that it is the duty of those receiving such advice or admonition to give it weighty •consideration, to the end that peace and unity may prevail throughout the society.
According to the rules of the society, we think the question of succession in the Ohio Yearly Meeting was a proper •subject for the consideration and judgment of other yearly meetings. And it is quite certain that both parties so understood the polity of the society at the time of the separation, as each submitted to the several other yearly meetings its claim for recognition as the only true and legitimate •Ohio Yearly Meeting.
The several meetings then in existence (save only Phil.adelphia, in which there was a divided sentiment) decided in favor of Binns and his associates, upon full consideration of all the facts involved in the controversy.
Are these decisions entitled to consideration and weight in this case ?
Without undertaking to review the adjudicated cases cited by counsel (none of which is exactly like the present in its facts), I will content myself with stating the principles, which, we think, are deducible from them, namely: 'That civil courts, in determining the question of legitimate succession, in cases where a separation has taken place in .a voluntary religious society, will adopt its rules, and will •enforce its polity in the spirit and to the effect for which •it was designed.
When public policy, or the positive law of the land, is mot contravened, the decisions and orders of the society, *287 ■when made in conformity to its polity, should have the same effect, upon the subject to which they relate, in civil ■courts", which the society intended should be awarded to them when pronounced by its own judicatories.
If such society be composed of separate bodies, whether co-ordinate or subordinated, the rules of the society for the management of its internal affairs, and for the adjustment of the relations between its branches, constitute the law by which they should be governed.
Applying these principles to the facts of the case before us, we are of opinion that the decisions of the several yearly meetings of the society, in relation to the succession in the Ohio Yearly Meeting, are proper and legitimate •evidence in the case, and are entitled to great weight as intelligent opinions and judgments upon the subject. And when considered in connection with the circumstances of the separation, and in view of the principles upon which the Ohio Yearly Meeting was organized, they satisfactorily show that the meeting over which Binns presided, affiliated with the undoubted regular women’s meeting, was and is the true “ Ohio Yearly Meeting of the Society of Friends,” within the terms and meaning of the grant, whereby the trust estate in controversy was created. Decree for plaintiffs.
West, J.*
The great importance of the present controversy to a large and very respectable body of Christian people, has commanded for it the-most profound consideration of the court. It involves less a question of value than of legitimacy, the nature and character of which are briefly as follows:
In the year 1832, William Hamilton conveyed certain real estate, which is the subject of controversy, situate at Mount Pleasant, in Jefferson county, to John Street, Jacob Holloway, Benjamin Hoyle, and Henry Crew, trustees, and to the survivor of them, and to the heirs at law of such survivor forever, in trust for the use of “ The Ohio Yearly *288 Meeting of the Society of Friends.” The said premises-were purchased by the yearly meeting, for-the purpose and with the design of erecting and maintaining thereon a boarding-school for the use and benefit of the said yearly-meeting, and was in fact appropriated and applied to such use. In and by the deed of conveyance, it was declared and plainly set forth that said grantees should hold said premises, subject to any disposition which said Ohio Yearly Meeting might, at any time thereafter, make of the same, and upon the request or order of said Ohio Yearly Meeting-convey or transfer the title to said premises to such person or persons, and upon such conditions and terms, as said Ohio Yearly Meeting should at any time direct and require.
On first 8d day, 9th month, 1854, the said Ohio Yearly Meeting separated into two bodies, of which JonathanBinns and Dr. Benjamin Hoyle were the respective heads,, each claiming to be the true and legitimate Ohio Yearly Meeting of the Society of Friends. Henry Crew and Dr. Hoyle were the only surviving trustees holding title to-said premises. In 1855, the meeting of Jonathan Binnsordered and directed the said survivors to convey the said premises to certain designated persons, in trust for the uses> aforesaid, which order and direction Henry Crew complied with, and under which the plaintiffs claim. Dr. Hoyle’s-meeting ordered and directed the said survivors to convey to other designated persons, in trust for the uses aforesaid,, which order and direction the doctor complied with, and under which the defendants claim.
The meeting of Dr. Hoyle having obtained, and ever since the separation, kept possession of the said premises- and boarding-school, to the exclusion of the members and children of the Binns meeting, the plaintiffs, trustees of the latter, biing this action to compel the defendants,, trustees of Dr. Hoyle’s meeting, to convey title, and surrender possession.
The record thus presents the question: Is the meeting of' Jonathan Binns the true and legitimate Ohio Yearly Meetingof the Society of Friends ? If this proposition is affirmed,. *289 the relief asked must be granted; otherwise, it must be denied.
The cause was heard in 1868, in the District Court of Jefferson county, wherein a voluminous mass of testimony was taken and certified to this court with the record, under an order of reservation. While it is a labor almost Herculean to digest this volume, it is no less gratifying than it is remarkable, to observe that in the statements of facts by opposing witnesses no substantial or material differences-intervene. Almost the only differences are of opinion as. to the effect of the facts stated, not as to the facts themselves. The consideration of the case is therefore happily unembarrassd by conflict of evidence.
Preliminary, and essential to the disposition of • the-question presented, is an understanding of the ecclesiastical polity of the Society of Eriends. The society was founded at an interesting period in English history, near the middle of the seventeenth century. The translation of King James had given the Holy Scriptures to the two generations next preceding, which had greatly stimulated religious inquiry. Through them, they were brought face-to face with the Almighty, and beheld the glory of His-brightness shedding a divine radiance directly upon the-hearts of believers. A profound sense of individual accountability threw distrust upon the efficiency of hierarchalmediation. A revolution in religious sentiment and ecclesiastical polity was the consequence. Puritanism supplanted prelacy. But neither puritanism nor prelacy satisfied the divine inspirations of George Eox. To his gentle-spirit it seemed little different whether presbyter or bishop stood between the people and their God; whether the altar was sustained by the sword of Cromwell or the scepter of Charles. They were alike incompatible with the mild virtues, holy precepts, and divine practices of true religion, which was not of the head, but of the heart; not of the lips, but of the life; not of form, but of fraternal love. Recognizing the image of God traced in the consti *290 tution of individual man, of whatever condition or clime or race, inequality in the temple and before the shrine was to him incompatible with the doctrine of personal accountability. Every form of ecclesiastical authority was therefore •delusive, even destructive, tending to pride, arrogance, and ■oppression, dimming the heavenly light of direct commu’nieation by reflection through an earthly medium; weakening the sense of homage due to the Creator, by sharing it with the mitre and surplice of the creature. As a consequence of these teachings, “ no lords over God’s heritage” became fundamental in the system of Eox, supplanting presbyter and prelate, priest and bishop, synod and conclave, and every form of ecclesiastical authority, power, or supremacy by which was recognized the unequal dignity of men or their unequal proximity to the ■countenance and glory of the Holy One.
A pure democracy, therefore, seemed to him the only ■form of ecclesiastical government compatible with the ■doctrine of individual accountability, and the fullness of that perfect religious liberty indispensable to its observance. Accordingly a system of exceeding simplicity was established, consisting of a series of popular assemblages ■called meetings, subordinate and accountable — the primary or preparative to the monthly, the monthly to the quarterly, and the quarterly to the yearly, which is the highest disciplinary judicatory in the society. Meetings of superior rank severally embrace a number of the next inferior rank, ■each having separate and distinct territorial boundaries, which can not be infringed or obtruded upon by another. The several subordinate meetings, except preparative, within the j urisdiction of their next superior, choose and •send representatives to attend and participate in the deliberations of the latter; but they are not invested with exclusive power as a distinct body, such as are possessed by -secular legislatures and the judicatories of many other •religious denominations. All members of the society resident or sojourning within the jurisdiction of any meeting have the equal right voluntarily to attend upon and have *291 ■a voice in its proceedings, the representatives being ■charged with the special duty of' such attendance, lest, if volunteers were exclusively relied on, default might be made, and the subordinate meeting be without representation in the superior body. The several meetings, except the preparative, hold sittings for worship and sitings for discipline, in the latter of which cognizance is taken, original or appellate, of all questions of faith, polity, business, or discipline within their respective jurisdictions, which are finally determined by the popular sense. These sittings are presided over, and the sense of the assemblage collected and recorded, by stated clerks, in whom is vested the only semblance of authority recognized in the polity of the society. The clerks of the yearly meeting are annually appointed by that body. It is made the special duty of the representatives, at the close of the first sitting for discipline, to select persons for clerk and assistant, and nominate them to the meeting at its next sitting; and, on being confirmed by the meeting, they are installed. If they are rejected, and no others put in nomination, the former clerks are continued in their respective stations.
The mode of conducting business is in accordance with the benign principles of the society. Discarding the rule of the mere majority, the “ solid sense” of the meeting controls, in collecting and weighing which regard is had to age, experience, wisdom, and solid judgment, irrespective of numbers.
It is said the history of the society contains no instance of a decision by ballot, show of hands, viva voce, or other usual mode of ascertaining the majority of numbers. ■
If the solid sense of the meeting be against the pending proposition, it is necessarily lost. But the converse is not necessarily true. To carry the affirmative, general unity is essential. Although the prevailing solid sense favor it, if a considerable opposition refuse to acquiesce or submit, the proposition is either dismissed or postponed for future ■consideration.
This polity is doubtless founded on an abiding faith in the presence of a divine light illuminating the understand *292 ing and directing the judgment of true believers, more or less perfectly apprehended according to experience, growth in grace, and solid wisdom. While, therefore, absolute’ unanimity can not be required of those among whom may be expected some incapable of apprehending the light, general unity is nevertheless practicable and essential to-the eschewing of strifes, the avoidance of heart-burnings,, and the preservation of that fraternal harmony and spiritual equanimity demanded by the benevolent practices and social virtues of the society.
These observations sufficiently present the organic-, peculiarities of the society and its mode of exercising authority by its local judicatories. But another characteristic’ merits remark. The Society of Eriends is a unit throughout the world. In its infancy it was embraced within the-yearly meeting of London. As by colonization and conversions in distant parts of the world, the remoteness of domicile made annual revisitations to the maternal roof' inconvenient and impracticable, other yearly meetings-were set up with the assent of London, co-equal in dignity and power. But the unity, the oneness of the society, with the rights, relations, and privileges of its members therein,, was preserved inviolate, the division being of authority only for mere convenience. In a peculiar and strict sense-is the social unity — the societas — of this people maintained,, not by identity of religious doctrines merely, which may be common to distinct bodies between which the nonexistence of social relations is absolute, but by general conferences;. by committees of sufferings, annually appointed by the respective yearly meetings, with the right, of united deliberations; by annual epistolary correspondence of the various yearly bodies; by mutual visitation by the rights of inter-certification, and the universally asserted and respected claims on benevolence and charity,, whereby it is said no member of the society is the recipient of public alms on either continent; by common contributions to its educational and eleemosynary institutions ; and by the laws of birthright, under which the children of the* *293 .•society in any jurisdiction of the world, are born to all the rights, privileges, and immunities of members in every •other.
Fundamental in the constitution, and essential to the -existence of the society as a unit, is the observance of its -disciplinary laws, without which it must crumble and dissolve. The extreme penalty of these laws is excommuni'Cation or disownment. Let the offender, who “ will not hear the church, be unto thee as a heathen man and publican,” is their severest denunciation.
A person formally excommunicated by the judgment of ■one meeting can not be readmitted to membership in the •society by another meeting, without the consent of the ¡meeting which pronounced the sentence. This rule is vital •to the unity of the society. For, as the whole structure must dissolve if the right of inter-certification be not recognized and respected, so the receiving into fellowship by one meeting of a person against whom stands a judgment of unworthiness by another meeting, can not fail to disturb the harmony of their relations. The certification of such person back to the meeting in which such judgment ■of unworthiness stands recorded, can not be recognized ■or respected by the latter. The observance of the rule, that the judgments of excommunication formally pronounced by any meeting of the society shall be respected, .and the offender excluded by every other meeting of the society, is therefore essential to its existence, the non■observance thereof working the disownment of the recusant body, with forfeiture and loss of all the rights and •privileges which the membership of the society commands ■or confers.
It is also expressly required by the printed laws of the ¡society, that “ elders, overseers, and others concerned for the support of the discipline, exercise a care that meetings .for business be kept select, not permitting those who have not a right of membership to sit in those meetings.” To the uninitiated this may seem of minor importance, but to the true Friend it is of vital significance. It is this which *294 separates and distinguishes the society from the world’s people; withdraws them in their sacred deliberations from the presence of the scoffer, and gathers and binds them .as a sheaf, in the bond of a holier fraternity. The sitting for discipline is thus the holy of holies in the temple of the-society.
The pertinency of these observations to the present controversy will appear in the discussion of the facts out of' which it arose. Previous to the convening of the Ohio-Yearly Meeting in 1845, Thomas Wilbur and Thomas B. Gould were disowned and excommunicated from the society by the proper subordinate meeting having jurisdiction* of them in New England. On appeal by them, to New England Yeaily Meeting, the judgment of the inferior judicatory was affirmed. They, with a few sympathizers, whom they induced to follow them, set up a separate yearly meeting, of which Thomas B. Gould was chosen clerk, which they claimed to be the true and legitimate New England Yearly Meeting of the Society of Friends. These-separatists, asserting that the Ancient Yearly Meeting of New England had countenanced and tolerated innovations of doctrine, and departures from the true faith, appealed to the great brotherhood of yearly meetings throughout the world to recognize them and reject the ancient meeting. But they were repudiated by all, except Philadelphia and Ohio, in which bodies they had so strong a force of sympathizers, that neither the recognition nor the-repudiation of either body in New England, could be-effected without the peril of schism.
Ohio Yearly Meeting convened in 1845. Dr. Benjamin-Hoyle, its clerk, was in sympathy with the New England separatists. The representatives being also divided on the-same disturbing question, were unable to agree upon, a person to put in nomination as his successor. .Actuated-by a spirit of forbearance, and an abiding faith that the-deliberations and light of the future would work harmony and reconciliation, they united in declining to nominate or present any name for successor, and reported to the meet *295 ing accordingly. No name being reported by tbe representatives, or nominated in tlie meeting, the continuance of the former clerk was the alternative, and it was so ordered. This was repeated at five of the seven succeeding meetings.
But instead of reconciliation, the breach widened. In 1849, a conference of yearly meetings was convoked at Baltimore to consider the situation. This conference entreated Ohio Yearly Meeting, in a spirit of love, to recognize the ancient New England body, and maintain the unity of the brotherhood; warning it of the more severe action the other yearly meetings would in sorrow be compelled to take, if its course was persisted in. They said i
“ In the exercise of those functions which legitimately and exclusively belong to itself, as the forming or administering its own discipline, any interference by another yearly meeting, or attempt to control its action in these respects, is an infraction of an established order and fraught with consequences perilous to the whole brotherhood of yearly meetings, against which we feel solemnly bound to bear testimony. An abridgment of the right of members by refusing to receive credentials issued by the meetings in another yearly meeting, except for cause provided in discipline, is subversive of the established order of society. On the other hand, any attempt on the part of the meeting to confer upon individuals privileges which they have forfeited in their own meeting, or to sustain them in assumed rights to which they are not entitled, can not fail to produce confusion and disturb the harmony of Exiends.
“We desire most earnestly, but affectionately, to urge Eriends everywhere solemnly to reflect upon these things, and where thex’e has been any departure from the long-established order of our religious society, under whatever pretext, that they pause and endeavor to realize the effects that must inevitably result therefrom. It is not to be expected that the great body of Eriends can long remain passive, if important and vital practices and usages of our *296 society, which are essential to our prosperity as a people, are neglected and violated.”
Ohio Yearly Meeting declined to hear this voice of entreaty. In the meantime the New England controversy found its way into the civil courts. It came before Chief Justice Shaw, in Earle v. Wood, reported, 1854, in 8 Cushing. In an opinion of great clearness and learning, he affirmed the legitimacy of the ancient New England Yearly Meeting, as well in respect to doctrine as to succession, and repudiated the pretensions of the separatists as groundless and usurpatory. Thus, by the courts of law and all the ecclesiastical bodies of the society which had ■spoken, the separatists of New England were solemnly pronounced not to be “ of the Society of Friends.”
Notwithstanding this, Hr. Hoyle and his partisans in sympathy with the separatists, according to the statements cf the annual epistle in evidence, tolerated disorders and practices of a character subversive of fraternal relations and of the rules and usages deemed vital and essential to the unity of the society. They refused to receive the annual epistle from the ancient New England Yearly Meeting, or to have fellowship with it. In some instances, they closed the meeting-houses against' accredited ministers from that body, refused to recognize the credentials of ministers in good standing, in other yearly meetings, and to receive and read official documents, accompanied by committees, from other yearly meetings. They refused to give certificates of removal to members in good standing, thus abridging their rights, and tolerated and encouraged the presence of persons, disowned by their own meetings, in the select sittings for discipline, against the solemn remonstrance of'Friends. They persistently declined to name or choose a successor to the clerk, Dr. Hoyle, who encouraged and sympathized with these disorders and practices. Such are the uncontradicted and painful recitals of the epistle.
Under these circumstances, the Ohio Yearly Meeting, of 1854 assembled. It was regularly opened by the clerk, *297 Dr. Hoyle. The great body of the society and the civil tribunals having pronounced against the separatists of New England, it could no longer occupy an ambiguous position. It must observe the traditions and discipline of the society, or sever its connection therewith. But the affectionate ■entreaties and solemn warnings of the brotherhood were not regarded. In flagrant violation of its most sacred law, 'Thomas B. Gould, the disowned separatist of New England, was openly conducted by members to a seat in the ministers’ gallery in the first sitting for discipline. The irregularity was remonstrated against, and a demand addressed to the •clerk to have the meeting made select, and the proceedings suspended, according to usage, until the obtruder withdraw. ‘The clerk, Dr. Hoyle, informed the objectors that they were at liberty to make the meeting select if they could ■do so without violating the peaceable principles of the society ; but that it was unreasonable to delay the entire business of the yearly meeting for that purpose. It was urged in reply that to tolerate the intrusion would virtually nullify the fundamental laws of the society, disregard the ■solemn disciplinary judgment of a co-ordinate meeting without its consent, and officially recognize the disowned separatists of New England, between whom and the great brotherhood of the society a choice must be made. These objections being still unheeded, the remonstrants asked an adjournment, which was finally carried.
At the close of the sitting, the representatives, forty-two in number, convened to nominate a clerk and assistant. Fourteen of the number presented the names of Jonathan Binns and James B. Bruff. No other names were suggested. It is true, Nathan Hall thinks Dr. Hoyle’s name was also suggested. 'William Fisher says: “ There was a portion of the body in favor of the old clerks holding over.” It was undoubtedly urged that the effect of a disagreement on names -would be to continue Dr. Hoyle in the position; and thus Nathan Hall, imperfectly recollecting the facts, thinks Dr. Hoyle was named for reappointment. But the evidence is clear that he was named only *298 In connection with the claim made by his friends, that he would necessarily hold over, as in past years, in the event of disagreement.
The friends of Jonathan Binns, impressed with the conviction that a change of policy, and therefore a change of clerk, was necessary to maintain their relations to and rights in the society, declined to unite, as in former years, in a report of disagreement and the non-presentation of names for clerk and assistant. They, on the contrary, refused to acquiesce in the further holding of the old clerks, by uniting in such report, and resolved to appeal from the disagreement of the representatives to the sense of the-general meeting. Jabez .Coulson was accordingly designated by them to carry in the appeal and present the names of Binns and Bruff for clerk and assistant, and ask an expression of the meeting on their nomination. Nathan Hall was designated by the other representatives to report their disagreement.
When the meeting assembled on the following morning,. Jabez Coulson, in behalf of a minority of the representatives, reported that he was directed by them to present the names of Jonathan Binns and James B. Bruff for clerk and assistant. Nathan Hall very soon after reported that the representatives were unable to agree on names for clerk and assistant. The -clerk, Dr. Hoyle, thereupon refused to-entertain or consider the nomination of Binns and Bruff, declaring it not in order; and, without reference or regard to the expression or sense of the meeting, announced it as-his opinion that the non-agreement of-the representativesipso facto wox'ked a contixiuance of the old clex’ks, and ixnmediately made a record to that effect. • The action of Dr.. Hoyle and the grounds thereof are stated in the printed argument of defexxdants’ counsel, as follows:
“ The clerk, Hoyle, as soon as he got opportunity, inquired of Hall if he was deputed to make his x-eport. Hall-answered that he was. The clerk then replied that his-report was in order and the other was xiot ixx order, and that he would make a minute accordingly, and he did make *299 the following minute : 1 Nathan Hall, on behalf of the representatives, reported that they had conferred together and' were unable to agree on names to offer to the meeting as clerk and assistant. Therefore, the Friends under appointment are continued in their respective stations — Benjamin Hoyle as clerk, "William S. Bates assistant.5 55
Aaron Frome, the stenographer, a witness produced by, the defendants, states that after Coulson and Hall made their reports, “Benjamin Hoyle arose and said, it was evident even from the report that Jabez Coulson had made, that Nathan Hall’s report was true; that the representatives were not able to agree, and that it always had been the usage of this meeting, under such circumstances, to continue-the old clerks; and which was the course he was now about to take as the only one, in his opinion, that could be pursued according to order; when he took his seat and commenced writing a minute.”
The foregoing very clearly shows that Dr. Hoyle did not act upon the sense of the meeting, solid or otherwise consequently, that he did not collect its sense; and therefore that the record made by him does not embody, or profess to embody, his official judgment of its weight, but his legal opinion of the effect of former usage. It is disclosed in the evidence, however, that the meeting, falling back on its sovereignty, gave a large expression — “ larger than was-usual on such occasions ” — in favor of the nomination of Binns and Bruff. So considerable was this expression that their friends, deeming it sufficient, directed them to go-forward and take their places at the table as clerk and assistant, which they did. But Dr. Hoyle, relying on former usage, and refusing to recognize the authority or action of the meeting under the circumstances, declined to surrender. Jonathan Binns thereupon made a record of what he regarded as the authoritative action of the meeting, and as the newly chosen clerk minuted the fact accordingly.
The result was an unfortunate separation and this most unhappy controversy. Two bodies have since existed, each claiming to be the true and legitimate Ohio Yearly *300 .Meeting of the Society of Friends, and each that, by vir'tue of its legitimacy, it is entitled to the possession and ■control of the controverted property. Extreme measures ■seem not to have been resorted to with inconsiderate and impulsive precipitation. More than a quarter of a century has elapsed since the origin of the disturbance. As before the separation nine years elapsed in the cherished hope that Christian forbearance and fraternal love would work ■conciliation, so fourteen elap>sed thereafter with the like hope that reason and reflection would bring adjustment without invoking the aid of civil authority. But the con•summation so devoutly to be wished was not attained, and the unhappy separation of this ancient, godly people, ■disciples of the mild virtues and gentle precepts of Pennington and Fox, must be confirmed, though with sincere regret, by judicial decree.
As the conclusion reached, from the facts developed, is .-adverse to the defendants, the points raised and relied on by them, will be first stated and considered. For them, it Is insisted that the organization was retained by and continued in the partisans of Dr. Hoyle, under and through whom, by regular and legitimate succession, is derived the title they assert.
One of the grounds relied on for the assertion of this legitimacy is the force of precedent. and former usage— 'inexorable in their power and effect to work a continuance of the old clerks, and therefore of the organization under them, in every case of non-agreement by the representatives on names to present for their successors. This was the assumption on which Dr. Hoyle acted.
The precedent here invoked speaks from a period not anterior to 1845. It had its birth in the disturbance in which the operative cause of separation originated. 1)3 six of the eight succeeding years, the representatives failing to agree on names for clerk and assistant, united in the non-presentation of any. Abiding in the hope that divine light would open the way to reconciliation, a resort to ultimate measures was declined with Christian forbear *301 anee from year to year, and the continuance of the old', elei'ks, though not approved, was submitted to. No successors being proposed either by the representatives or others, their continuance was the only alternative. •
But it would seem remarkable that forbearance to resort precipitately to ultimate measures, for the correction of a. grievance, should thereby ripen into a precedent of binding obligation, when longer forbearance in respect to it ceases to be a virtue. If forbearing to proceed in hot haste-shall become a precedent against proceeding at all, that which is most beautiful in principle and most divine in practice — moderation—will cease to characterize and distinguish the society, or its observance will become the-mere shield and bulwark of innovation and wrong.
But it is said the proceedings of the yearly meeting in 1854 were without precedent in its history. "In former-years, the representatives united in the non-presentation of names; in 1854, they did not so unite. Previously, on the occurring of disagreement among the representatives,, names for clerks were not reported by any portion of them,. nor proposed by voluntary suggestion in the meeting. In 1854, names were reported by a portion of the representatives, acting on the conviction that longer forbearance had ceased to be a virtue, and must work the forfeiture of their rights in and a severance of their relations to the great, brotherhood of the society. In previous years, the report of disagreement and the minute continuing the old clerks were silently submitted to; in 1854, they were not. In these particulars, the proceedings of former meetings furnished no precedent for the guidance or government of its-action in 1854, which was in the nature of an appeal from the disagreement of the representatives to the sovereign power and sense of the general meeting. That sovereignty created the rule authorizing the representatives to-nominate clerks, and the same power which created could, abrogate or suspend it: A mere usage or precedent: could have no greater sanctity; they could not control sov *302 ■«reign power. The claim founded on assumed usage and precedent may therefore be dismissed.
Was the appeal from the disagreement of the representatives sustained, and the nomination of new clerks approved by the expression of the general meeting ? It is urged that they were not, because the solid sense of the representatives was adverse. It is true that a majority of the representatives non-cOncurred; but whether the prevailing solid sense of that body was embraced therein, it having no presiding officer to gather and record the same, is not disclosed. But, if it were so, the question would be presented, whether the solid sense of a committee shall prevail against the solid sense of the sovereign body, creating it, the solution of which is neither difficult nor ■doubtful. The fact of an appeal to the general meeting presupposes the possibility of an adverse expression by the representative body, the right and power to overrule which was conceded by the partisans of Dr. Hoyle, in the •discussion reported by the stenographer Aaron Frome, and is very clearly asserted by Nathan Hall and Dr. Hobbs. If it were otherwise, the power would rest in a faction of the representatives to subvert the constitution and work a •dissolution of the society, by continuing in position a disorderly, disorganizing- — it might be, heretical — clerk,or by refusing, in case of vacancy, to agree upon a successor. The general meeting, having the power to act independently of the representative body in any case where the necessity therefor exists, may exert it in every case, itself being the sovereign and exclusive judge of such ■necessity.
■ It is further urged that the appeal can not be held to have been sustained, because Dr. Hoyle, whose duty it was, as clerk, to collect and record the sense of the meeting, made a minute continuing himself in office, by which, >as a solemn official record, this court is concluded. Such ■record, if it contained, or professed to contain, the official judgment of the clerk upon the sense of the meeting, would be entitled to great weight and consideration; but *303 it is not seriously contended that it does either. It is founded upon and professes to express only the opinion of Dr. Hoyle as to the force and effect of former usage, in case of a disagreement by the representatives. It not only does not embody the collected sense of the meeting, but was made without regard to, and in open, denial of, its light and authority to give an expression of its sense against what he considered the conclusive effect of former usage. Therefore, the minute of Dr. Hoyle sheds no light on the inquiry as to the sense and expression of the meeting on the appeal, and may be put out of view in its discussion.
The clerk, Dr. Hoyle, having refused to collect, or pronounce official j udgment in regard to the sense and expression of the meeting on the appeal, we are compelled, in the absence of. any official record embodying such expression, to look into and gather it from the recollection of witnesses. By this, it is clearly shown that the expression of unity with the nomination of Jonathan Binns was very considerable — larger than was usual on such occasions; considerably larger than the expression against it. On this point, there is no conflict of testimony, while that of Oeorge K. Jenkins, produced by the plaintiffs, and of William S. Bates, produced by the defendants, is full and explicit.
Recognizing the right of appeal from the disagreement of the representatives, can the court, in the absence of any official judgment by the clerk, do otherwise than give effect to the clearly preponderant and unusually large expression of the meeting thus disclosed in the evidence ? It can not avail that a majority, influenced by some concealed motive or mental consideration, may have abstained from participating. Only the fact of silence, not the mental or mistaken reasons that influence it, can be regarded. Nor can it avail that, subsequent to the expression, a majority acted adversely to it. Subsequent conduct can not reverse an accomplished fact. Therefore, by the clear preponderance and unusually large expression of the meeting, the *304 appeal must be held to have been sustained, and Jonathan Binns legally elected clerk in 1854.
Bid a cause exist to justify an appeal from the action of the representatives to the sovereign sense of the yearly-meeting ?
Considering the important interests jeopardized by the-continued toleration of disorder, this can hardly be doubted-As already stated, the Society of Friends is a unit throughout the world. It is in nature and constitution a confederation of all the ecclesiastical bodies in unity with the common brotherhood.
Pursuant to the general constitution of the society, a. conference of committees from its several ecclesiastical bodies in unity convened at Baltimore in 1849, and addressed the advisory epistle to Ohio Yearly Meeting before referred to. But its solemn admonition was disregarded. Further and further it was being swept from its-moorings of unity, carrying with it alike the willing and the unwilling. A crisis was reached in 1854, when rescue-must be 'attempted, or the loss of rights in the great brotherhood be inevitable. Nothing but a change of policy could avert the impending peril. The faithful to the essential practices and vital usages necessary to preserve-their unity with and rights in the general society, could not-remain passive and be carried away from their ancient anchorage. The time had come, events had arisen to justify an appeal from the disagreement of representatives, to the solid sense of the yearly meeting. True, it was an unusual proceeding, may be regarded as extraordinary— revolutionary, if you please — a contest between loyalty and. disloyalty. But emergencies are necessarily unusual, and xxot to combat them with extraordinary means is to sacrifice substance to form. Jonathan Binns and his associates resorted to such appeal. It was the only course left to-them, and they were justified.
But the election of Binns and the legitimacy of the-body that remained with him received a further and the very highest sanction. They were recognized by the solemn *305 judgment of the common brotherhood. This had the authority of the precedents, traditions, and the immemorial usages of the society, which, though unwritten, were as the common law for its government. An example is furnished in the history of the Elias Hicks disturbances, and again in the New England separation of 1844, when the affiliated bodies interposed their united voice. It was not interposed by comity, but by authority as of right. Both of the Ohio meetings are estopped from denying the authority of such judgment, as both appealed to it for rec-' ognition in 1854.
Extracts from the epistle addressed by Hr. Hoyle’s meeting have been given above. The epistle addressed by the Binns meeting contained, among other things, the following :
“ Our yearly meeting, the present year, has convened under circumstances peculiarly trying. In order to acquaint you with the nature of which, it seems necessary to look back over years of suffering that have passed.
“At our yearly meeting of 1845, a number of our active members objected to continuing our correspondence with New England Yearly Meeting, alleging unsoundness in that body as their objection. Many Friends then believed, and so expressed, that such opposition was without any real cause, and that if it was indulged in, it would have a tendency to- scatter and divide this yearly meeting, which sentiments were disregarded, and the clerk informed the .meeting that the epistle from New England could not be read unless the one from the smaller body (as he termed it) should also be read.
“ Since that time (with one exception, when both were read, but no further notice taken of them), he has decidedly refused from year to year to read the New England epistle, up to 1852, after which that meeting refused to send any epistle to us.
“ Time has already proven that the views of Friends, as then expressed, were founded in truth. Those individuals *306 have failed to show unsoundness in New England Yearly Meeting as alleged. Yet the discord and disregard of the discipline have been increasing amongst us from year to year, and the fears of Friends have-been sorrowfully realized.
“Friends traveling in the ministry have been openly charged with unsoundness, and in one instance the meetinghouse was closed against a minister in good unity with Friends. In some places elders and active members have refused to attend meetings appointed by different yearly meetings, with full credentials from their Friends at home.
“ In some instances certificates of removal have been refused, the rights of members infringed upon, and high charges made against members of good standing. In some meetings no agreement could be come to for the appointment of clerks, overseers, members of the meeting, or of the select body.
“We have also been intruded upon by the separatists from New England and New York Yearly Meetings, attending our meetings for discipline, such persons being en-.couraged by our own members to sit in the meetings, and i,the clerk proceeding with the solemn remonstrance of IFriends.
“ The clerk of the yearly meeting has also, at different "times, proceeded with the business while persons who have ffeen disowned were present, after Friends had earnestly .remonstrated against it, and entreated that such persons ;should leave the meeting. At our last yearly meeting both .men’s and women’s meetings were intruded upon, and the meetings detained four days in endeavors to have the intruders removed before the business should be proceeded with, as directed by our discipline. But they being supported by many of our active members, and the clei’k manifesting a determination to proceed, the endeavors of Friends were unavailing.
“ The clerk has also refused- to read documents sent to •.this meeting officially by other yearly meetings-, accompacnied by committees. Thus the disunity and discord man- *307 ifested in our yearly meeting, and in many of onr subordinate meetings, for several years past, have thrown the society within our borders into a sorrowful and deplorable condition, which was our state at the commencement of this yearly meeting.
“When the select meeting assembled on 7th day, Thomas B. Gould, one who had been among the most active in producing the difficulties in New England, and clerk of the yearly meeting of separatists there, was conducted into the gallery by one of our own members, and when the meeting was opened, he produced a certificate from one of their separate meetings. ITis attendance was objected to by many Friends, and it was clearly shown that such certificate, coming from a branch of that separate body, which is not owned by any yearly meeting of Friends in the world, could not consistently be produced to the meeting, nor could he who held such have a right to sit therein.
“ The certificate was not read, but the privilege of the individual to remain in the meeting was advocated by some, and appeared to be countenanced by all those who had taken a stand against the ancient yearly meeting of New England, and the clerk proceeded with the business in his presence.
“ When the yearly meeting convened on second day, the individual before alluded to, in company with some of our own members, proceeded to the upper seat, he being traveling as a minister, placed in that station by the separatists of New England, and, we understand, expected, as such, to attend our subordinate meetings, which, if allowed by us, would be owning the acts of the separatists, in their official capacity, a body that all the yearly meetings, except Philadelphia and Ohio, have testified against by minutes.
“After the meeting was organized, and the minutes of Friends in attendance from other yearly meetings were read, it was stated by a Friend that he believed there were one or more persons in the meeting who had not a right *308 there, and he thought the meeting should be made select before any other business was transacted.
“ This was united with by many Friends, hut some of those who encouraged the intrusion stated that they knew of none in the meeting who had not a right to sit therein.
“ The meeting was then informed that Thomas B. Gould had been disowned previous to the separation in New England Yearly Meeting.
“ A number of representatives, as well as other Friends, requested him and his traveling companion, who was also present, to withdraw, but they refused, and Thomas B. Gould, at some length, vindicated his cause. The clerk was also desired to request them to withdraw from the meeting, but declined, thereby giving countenance to this inroad upon discipline.
“ After considerable time being spent in earnest appeals by Friends to have the intruders removed, and responses from those who supported them in their intrusion, Friends becoming satisfied that no endeavors would be made by the .clerk, or any of those in sympathy with the separatists to have the meeting made select, proposed to adjourn.
“ On 3d day morning, after the opening minute was read, one of the representatives informed the meeting that they had conferred together, and that a considerable portion of them had agreed to report the names of Jonathan Binns for clerk and James B. Bruff for assistant, which accords with the requisition of our discipline.
“ An unusually large number of Friends expressed their unity with the report and with the appointment of the Friends named therein, and very few voices in the meeting dissented.
“ Another of the representatives, who- has been, from the beginning, a supporter of the separatists in New England, was informed that they had met, but could not agree upon names for clerk and assistant, whereupon Benjamin Hoyle made a minute, which he soon after read, continuing himself and the former assistant as clerks.
“ After some time, the two Friends whose names were reported by the representatives and so fully united with, *309 were requested to go to the table, very few in the meeting objecting, but the former clerk still remained there and kept the books and papers in his hands. After taking their seats, urgent requests were made by some of those who favored the intrusion of Thomas B. Gould, that they should leave the table, but when a suitable time appeared, Jonathan Binns read the minute of his appointment as clerk and of James B. Bruff as assistant.
“ Friends not being willing to proceed with the business •while the intruders remained, had continued some hours in this situation, Benjamin Hoyle and the new clerk and assistant at the table, when Benjamin Hoyle made a minute of adjournment, and those members who had manifested so much disaffection for years, together with Thomas B.Gould and his companion, and ‘William Evans and Charles Evans of Philadelphia, left the meeting; Friends and all the ministers and strangers from other yearly meetings, except those above named, having remained in the house.”
To these appeals came back the response fully recognizing the action of the Ohio meeting in the election of Jonathan Binns and the legitimacy of the organization under him, and testifying against and discarding the meeting of Dr. Hoyle as irregular and disorderly.
From these considerations it results that the meeting of which Jonathan Binns is clerk, is the only body of Friends in Ohio which has continued in unity with the general society; that having so preserved its unity, it continued to be, and now is, a constituent part of that society, and hence is the Ohio Yearly Meeting of the Society of Friends.
The grant of the promises in controversy was in trust for the Ohio Yearly Meeting of the Society of Friends.
The plain import of the language is not to a body or aggregation of persons similar in faith, doctrine, or discipline to Friends, yet independent of, and distinct from their general society, butto abody fraternizing andin unity with the general society throughout the world, known as the Society of Friends, and recognizing its authority, its admonitions, its conferences, and its counsels, and the rights, privileges, duties, charities and obligations of its universal *310 membership. The meeting of Jonathan Binns is such body. For it the grant was originally intended. To it the trust necessarily inures. The decree must therefore be entered for the plaintiffs.

 This case was decided at the December term, 1872, when Judge West was a member of the court.